# UNITED STATES DISTRICT COURT **FILED**

for the

Eastern District of California

**JAN 10 2019**

**CLERK, U.S. DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| Mosab Mohammad Salman Al Harasees | ) | 2: 1 9 - MJ - 0 0 0 9 DB |
| | ) | |
| | ) | |

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____January 9, 2019_____ in the county of _____Sacramento_____ in the

___Eastern___ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(5) | Alien in Possession of a Firearm |

This criminal complaint is based on these facts:

(see attachment)

☒  Continued on the attached sheet.

_____
_Complainant's signature_

Joshua Wood, HSI Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date:  1-9-19

_____
_Judge's signature_

City and state:  Sacramento, CA

Deborah Barnes, U.S. Magistrate Judge
_Printed name and title_

**Affidavit in Support of a Criminal Complaint, Arrest Warrant, and Search Warrant**

I, Joshua Wood being duly sworn, depose and state as follows:

**PURPOSE**

1.      I make this affidavit in support of a criminal complaint and arrest warrant for

**Mosab Mohammad Salman AL HARASEES** (DOB: XX/XX1987, NVDL: 17XXXXXXX1,

Alien file number: A0XX XXX XX5; hereinafter **AL HARASEES)** for being an alien illegally

or unlawfully in the United States in possession of a firearm in violation of 18 U.S.C. § 922(g)(5)

and to search the following property:

       a.   Apartment # 7 located at 9152 Schmuckly Drive, Sacramento, California,

          including any safes or other storage containers inside the residence

          **(TARGET RESIDENCE)**; and

       b.   A red iPhone with a black case with IMEI 35 584108 513727 9

          **(TARGET CELLPHONE)**.

**AGENT BACKGROUND**

2.      I am Special Agent of the United States Homeland Security Investigation (HSI) a

division of the Department of Homeland Security (DHS).  I am currently assigned to the

Gangs/Narcotics Unit of the Sacramento Field Office of Investigations.

3.      I received training as a Special Agent at the Federal Law Enforcement Training

Center (FLETC) in Glynco, Georgia, where I completed the Criminal Investigator Training

Program (CITP) and the Immigration Customs Enforcement Special Agent Training (ICESAT).

During this period I have received training in narcotic investigation matters including, but not

limited to, drug interdiction, drug detection, money laundering techniques and schemes, drug

1

identification, and asset identification and removal. I have been employed as a Special Agent since March of 2007 and I am currently assigned to the Narcotics/Gang Unit.

4.      My duties as a Special Agent include the development and evaluation of information in order to detect violations of federal law. As an HSI Agent, I have experience with investigations relating to both criminal violations of Title 18 USC, Title 21, and Title 8 USC (administrative violations) of the Immigration and Nationality Act. I have assisted agents from other HSI agents in the execution of search warrants relating violations of Titles 18, Title 21, and Title 8 of the United States Code.

5.      The information contained in this Affidavit is known to me through personal knowledge, record checks, reports of other investigating agents, and other reliable sources. This Affidavit is further based upon my training and experience as an HSI agent, the training and experience of other HSI agents that I have consulted in investigating this case. This affidavit is being submitted for the limited purpose of obtaining criminal complaints and arrest warrants, therefore I have not included every fact known concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for an order authorizing search warrant criminal complaints and arrest/search warrants. In such capacity, I attest to the following:

## **PROBABLE CAUSE**

6.      On January 9, 2019, Homeland Security Investigations (HSI) and Immigration and Customs Enforcement (ICE) and Enforcement and Removal (ERO) Sacramento were conducting surveillance on Apartment # 7 located at 9152 Schmuckly Drive, Sacramento, California (**TARGET RESIDENCE**) for **AL HARASEES**. **AL HARASEES** was ordered removed by an Immigration Judge at San Francisco, California on November 20, 2008.

2

7.      At approximately 0855 hours, ERO Deportation Officer (DO) Robert Hallanger

observed a male adult that resembled **AL HARASEES** walking towards his vehicle. At that

time, DO Hallanger, myself, and HSI Special Agent (SA) Rachel Ritchey approached **AL**

**HARASEES** while he attempted to enter his vehicle. DO Hallanger identified himself as a law

enforcement officer (which was also fully marked with "police" markings) and asked **AL**

**HARASEES** asked for his name. **AL HARASEES** stated his name was "Mosab" and provided

DO Hallanger a Nevada state drivers' license bearing his photograph and biographical

information that identified him as the same **AL HARASEES** that is subject for removal. DO

Hallanger asked if **AL HARASEES** had any documentation for proof of immigration status to

remain in the United States. **AL HARASEES** stated that he had an F-1 Visa and passport inside

a safe in the **TARGET RESIDENCE**.

8.      At that time, DO Hallanger detained **AL HARASEES** and placed him in

handcuffs. DO Hallanger asked **AL HARASEES** if he had any weapons on his person. **AL**

**HARASEES** stated that he had a "Glock" pistol on his person. At that time, DO Hallanger

asked me to search his person for weapons. While conducting the search, I found a concealed

handgun in a holster on **AL HARASEES** right side. The handgun has not yet been examined by

a firearms expert, but it appeared that the firearm had been manufactured from an unfinished

lower receiver and made to look like a Glock handgun.

9.      DO Hallanger asked **AL HARASEES** for permission for law enforcement to

enter the **TARGET RESIDENCE** to retrieve his passport from the safe. **AL HARASEES**

provided verbal consent[1] to enter the **TARGET RESIDENCE** to retrieve the passport but asked

that his girlfriend (Andrea AGUILAR-ENRIQUEZ), who was in the **TARGET RESIDENCE**,

---

[1] HSI Special Agent Brian Pellin obtained a signed consent to search form and Miranda rights form **AL HARASEES** subsequent to his detention and arrest.

be the one to open the safe.  DO Hallanger asked if there were any other firearms in the

residence.  **AL HARASEES** said there was not.

        10.     At that time, myself, HSI Special Agent Rachel Ritchey knocked on the

**TARGET RESIDENCE.**  AGUILAR-ENRIQUEZ answered the door.  I informed AGUILAR-

ENRIQUEZ that her boyfriend was arrested and needed to provide her the safe code for law

enforcement to retrieve his passport.  AGUILAR-ENRIQUEZ exited the **TARGET**

**RESIDENCE**, obtained the safe code from **AL HARASEES**, and returned with agents inside

the **TARGET RESIDENCE** to open the safe.

        11.     Myself, HSI Special Agents Brian Pellin and Rachel Ritchey escorted

AGUILAR-ENRIQUEZ inside the residence per AL HARASEES' consent and to ensure officer

safety while **AL HARASEES'** passport was retrieved.  Once AGUILAR-ENRIQUEZ opened

the safe to retrieve the passport, I saw what appeared to be firearms stored on the inside door of

the safe. At that time, I asked AGUILAR-ENRIQUEZ to step back from the safe due to the

observation of firearms.

        12.     After removing AGUILAR-ENRIQUEZ from the immediate area of the firearms,

I observed in plain sight numerous (approximately thirty) firearms and multiple boxes of

ammunition in the safe (see below).



13.     Visible in plain view was the stamp "Glock" on one of the firearms in the door of the safe.  I am aware from conversations with an ATF interstate nexus expert that Glock firearms are manufactured outside of California.

14.     At that time, HSI Agents froze the location in anticipation for obtaining a search warrant for the **TARGET RESIDENCE**, to include the safe.  HSI Special Agents Brian Pellin and Kristopher Kashuba advised **AL HARASEES** of his *Miranda* rights via an agency-issued card.[2]  **AL HARASEES** stated that he understood his rights and was willing to speak with law enforcement. HSI Special Agent Brian Pellin confronted **AL HARASEES** and said that agent observed several firearms in the safe (in contradiction to **AL HARASEES'** pervious statement to law enforcement).  **AL HARASEES** stated that "two" of the firearms were his friends' firearms and the rest were his. **AL HARASEES** gave consent to law enforcement to take possession of the firearms.

15.     During the interview, **AL HARASEES** informed HSI Special Agent Brian Pellin that he had video of himself firing weapons on the **TARGET CELLPHONE** in his possession. **AL HARASEES** provided consent for HSI Special Agent Brian Pellin to obtain the **TARGET CELLPHONE** and observe the videos. A review of the videos on the **TARGET CELLPHONE** depicted **AL HARASEES** firing weapons.

16.     DO Hallanger determined **AL HARASEES** to be illegally present in the United States.  **AL HARASEES** claimed to be a thirty-one (31) year old male, native and citizen of Jordan, who last entered in the U.S. in Chicago, Illinois on or about an April 24, 2006 as B-2 Visitor (non-immigrant) with authorization to remain in the United States for a temporary period not to exceed October 12, 2006.  On October 3, 2006, **AL HARASEES** adjusted his status from a B-2 to F-1 Student (non-immigrant) with authorization to remain in the United States for

---

[2] HSI Special Agent Brian Pellin obtained a signed Miranda rights form **AL HARASEES** subsequent to his detention and arrest.

duration of status of his education. On December 6, 2007, **AL HARASEES'** education program

ended. **AL HARASEES** remained in the United Stated beyond the December 6, 2007. On

November 20, 2008, an Immigration Judge ordered **AL HARASEES** to be removed from the

United States.

17.     In this case, the facts set forth in this Affidavit demonstrate probable cause **AL**

**HARASEES** did knowingly possess firearms that moved in interstate and foreign commerce

while being an alien illegally and unlawfully in the United States, in violation of 18 U.S.C.

Section 922(g)(5).

## CHARACTERISTICS OF FIREARMS TRAFFICKERS

18.     I know from my training, experience, and discussions with other experience law

enforcement officials that firearm traffickers and/or manufacturers frequently possess the

following evidence of their unlawful activity in their residences, places of employment, storage

units, vehicles, electronic devices, and on their persons:

19.     Firearms, lower receivers, upper receivers, grips, stocks, magazines, magazine

repair kits, trigger assemblies, variant lower receivers, and barrels;

20.     Information concerning where and from whom the trafficker/manufacturer

purchased firearms or firearm parts;

21.     Information concerning where and to whom the trafficker/manufacturer sold

firearms or firearm parts;

22.     Firearm records (purchase/sale, method of payment), notes or other

documentation concerning profits made (i.e., comparing cost of purchase vs. cost of sale);

23.     Customer files and lists related to the services provided or firearm sales;

24.     Records and/or documents provided to customers in connection with the services

provided or firearms;

25.     Correspondence to and/or from actual or prospective customers or suppliers;

26.     Records and/or documents reflecting or related to the purchase of equipment, materials, or supplies for the operation of the business;

27.     Records and/or documents of mailings, shipping or delivery, whether by the United States Postal Service or other private delivery services;

28.     Information concerning methods used to advertise the availability of their firearms or firearm parts for purchase;

29.     Photos of their firearms or firearm parts for purposes of advertising for sale, to keep track of their inventory, for insurance in case of theft, etc.;

30.     Written, recorded oral, or digital communications with associates involved in the purchase/sale of firearms or firearm parts;

31.     Written statements showing profits made from the sale of firearms or firearm parts for internal purposes;

32.     Bank deposit records, checking account records, and other financial documentation showing the purchase of firearms or firearm parts, the securing of cash to purchase firearms, and the depositing of cash proceeds from the sale of firearms;

33.     Other records and/or documents which appear to be related to the business including, but not limited to notes, internal correspondence, external correspondence, memoranda, directives, organizational charts;

34.     Cell phone records which show the phone number and subscriber information, and numbers called/received;

35.     Indicia of persons in control over a premises where the above items are found, including addressed mail, material in the premises with personal identification information, photographs of persons in or about the location, etc;

36.     Tools and equipment associated with the manufacture of firearms, including CNC machines, drills, drill presses, lathes, welding equipment, jigs, hack saws, power saws;

37.     Templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms;

38.     Cash received from the sales of firearms; and,

39.     Electronic devices, including cellular telephones, tablets and computers, used to communicate regarding firearms transactions, conduct related research, and maintain records of the purchase and sale of firearms.

40.     I know from my training and experience and discussions with experience law enforcement officers, that individuals that own firearms store the firearms in safes, gun safes, locked cabinets, and/or other secured containers.  I also know that individuals that possess firearms typically store their firearms in their homes.  They store their firearms in their homes for a number of reasons, including, to safely and securely store the firearm, for quick access to the firearm for personal and property protection, and for convenient access for use of firearms for sporting purposes.

41.     Through my training, experience, and discussions with other law enforcement officers, I know that individuals who traffic firearms for profit normally maintain records of their financial activities in their residence, including receipts for expenditures by cash and check, bank records, and other financial documents.  Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business and often use accountants to complete financial statements and tax returns for their business and personal returns both in the business and their home.

42.     I know that firearm traffickers and/or manufacturers, as well as criminal co-conspirators generally, use cellular telephones to communicate with one another, either by voice

or text message. Cellular telephones are digital devices that preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other firearm traffickers and/or manufacturers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Cellular telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by firearm traffickers and/or manufacturers is evidence of the associations of the firearm traffickers and/or manufacturers, some of which are related to his or her illegal business. Cellular telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a firearm trafficker's and/or manufacturer's mobile telephone can contain evidence of firearm trafficking and/or manufacturing because it shows the communications or planned communications of a firearm trafficker and/or manufacturer and the telephone numbers of those with whom the firearm trafficker and/or manufacturer communicated or intended to communicate. Cellular telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Firearms traffickers and/or manufacturers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Cellular telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by firearm traffickers and/or manufacturers. Cellular telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a firearms trafficker who took pictures of evidence of crime. Cellular telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

43.     In my experience and consultation with other law enforcement officers, firearm traffickers and/or manufacturers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product.  Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

44.     Repeated firearm trafficking and/or manufacturing activity over lengthy periods of time generates greater amounts of evidence.  Many items of evidentiary value, particularly computer and documentary evidence, are not illegal to possess and, therefore, not overtly incriminating in the criminal's view.  It is also a common practice for firearm traffickers and/or manufacturers to maintain personal property used or obtained in their criminal activities and which constitute evidence of their crimes for extended periods of time.

45.     As a result of my experience and training, I have learned that firearm traffickers and/or manufacturers maintain and tend to retain accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators and these records may be kept on paper or contained in digital storage devices.  It is also my experience that these traffickers and/or manufacturers tend to keep these accounts and records in their residence and in the areas under their control.  It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time.

46.     Based upon my training and experience, the above-described documentary evidence can be in paper form, or may be in digital form stored on computers, smart phones, digital notebooks, personal computers or any other type of digital storage device (e.g., thumb drives, external hard drives, etc.).  Although the above-described material and the devices holding the material would most likely be in their residence, it is also often found in their personal vehicles, in their personal work areas (desks, lockers, etc.) where they work, and/or

rented storage lockers.  In addition, since many persons these days carry their cellular telephones and, sometimes, digital notebooks, laptop computers, on their persons, it is often necessary to search and seize these items from the firearm trafficker's and/or manufacturer's person to secure this evidence.

47.     I know, based on my training, experience, and consultation with other law enforcement officers, that the number of firearm traffickers and/or manufacturers using computers and electronic information storage devices, like the general population as a whole, is steadily increasing, and such computer hardware, software, documentation, passwords, and electronic information storage devices may be instrumentalities, fruits, or evidence of crimes. Moreover, such computers and electronic information storage devices offer firearm traffickers and/or manufacturers and distributors convenient devices for recording information concerning firearms, including sources, co-conspirators and customers, records of purchases and sales, and any other information deemed pertinent by the firearm traffickers and/or manufacturers and distributor.  Much of the electronic media storage devices, such as floppy disks, zip disks, thumb drives, CD-ROMs, SD memory cards, are very small, detachable, portable, and can be secreted in small containers, such as safes and clothing pockets.  I also know, based on my training and experience, that firearm traffickers and/or manufacturers often communicate with their criminal associates and with potential buyers through the use of electronic mail, instant messaging, text messaging, telephone answering machines, voicemail, pagers, and telephones (cellular and land line).  To the firearm traffickers and/or manufacturers, these communication devices are part of their normal business equipment.

48.     Accordingly, based on this investigation and my training and experience, I believe that items listed in **Attachment B** will be found at the locations locations listed in **Attachment A**.

49.      Additionally, based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

[*Continued on the Next Page*]

## CONCLUSION

Based upon the facts set forth above, I believe there is probable cause to believe that evidence of firearms offenses, specifically, 18 U.S.C. § 922(g)(5) (alien in possession of a firearm), will exist inside the **TARGET RESIDENCE,** the **TARGET CELLPHONE,** and inside the safe described above. I therefore respectfully request that the Court issue a warrant authorizing the search of the locations as set forth in the affidavit and Attachment A, and authorize the seizure of evidence, fruits and instrumentalities of violations of 18 U.S.C. § 922(g)(5) more specifically described in **Attachment B**.

I also respectfully request federal criminal complaint and arrest warrant be issued for **Mosab Mohammad Salman AL HARASEES** for violation of 18 U.S.C. § 922(g)(5) (alien in possession of a firearm).

I state and affirm that the facts set forth in this affidavit are true and accurate to the best of my knowledge and belief.

Joshua Wood
Special Agent, HSI

Sworn to and subscribed before me on the _9th_ day of January 2019

HONORABLE DEBORAH BARNES
United States Magistrate Judge

Approved as to form

Cameron L. Desmond
Assistant United States Attorney

13

## ATTACHMENT A-1

### DESCRIPTION OF LOCATION TO
### BE SEARCHED

The **TARGET RESIDENCE** is located at 9152 Schmuckly Drive, Apartment #7,
Sacramento, California, 95826. The **TARGET RESIDENCE** is more particularly identified
as an apartment located in the northwest area of an apartment complex. The **TARGET
RESIDENCE** consists of beige stucco siding on one side and gray wood paneling on the other
side. The front door of the residence is green in color and the number "7" white in color is
affixed adjacent to the front door. Including all safes and storage areas within the residence.





14

## ATTACHMENT A-2

## <u>DESCRIPTION OF LOCATION TO</u>
## <u>BE SEARCHED</u>

A red iPhone with a black case with IMEI 35 584108 513727 9 (**TARGET CELLPHONE**).

## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

The following items constitute evidence, fruits, proceeds, and instrumentalities of violations of 18 U.S.C. § 922(g)(5) (alien in possession of a firearm).

1. Any and all firearms or ammunition.

2. Any items pertaining to the possession, manufacture, or distribution of illegal firearms, including but not limited to, lower receivers, upper receivers, grips, stocks, magazines, trigger assemblies, and barrels for AR-15-style firearms.

3. Any tools and/or equipment associated with the manufacture of firearms, including but not limited to drills, drill presses, lathes, welding equipment, jigs, hack saws, power saws, templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

4. Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms, firearm transactions, firearm parts, large sums of money and/or co-conspirators and paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B.

5. Records relating to the acquisition and distribution and repair of firearms, firearms parts, tools and/or equipment associated with the manufacture of machineguns, short barreled rifles and/or other firearms, including but not limited to ATF Forms 4473, California Dealer Of Record Sale (DROS) records, books, receipts, invoices, notes, ledgers, and pay/owe sheets.

6. Personal telephone books, telephone records, telephone bills, address books, correspondence, notes, and papers containing names and/or telephone numbers that tends to establish communication between co-conspirators, whether such documents are stored in documentary or electronic form.

7. Digital evidence of items described in Attachment B

8. Evidence and records relating to the accumulation of proceeds derived from illegal firearms trafficking and manufacturing, whether such documents are stored in documentary or electronic form.

9.  United States currency in excess of $2,000, including any and all financial records to facilitate the investigation of the laundering of illicitly obtained monies and/or other forms of assets, including United States currency acquired through the sales, trafficking, or manufacturing of illegal firearms.

10. Rental or lease agreements for storage units, safety deposit boxes, other storage locations, keys, combinations, and/or access codes for them, whether such documents are stored in documentary or electronic form.

11. Indicia of occupancy, residency, and/or ownership of the items noted above and of the premises, including but not limited to, papers, correspondence, canceled envelopes, canceled postcards, bills, and registration documents, whether such documents are stored in documentary or electronic form.

12. Any safes, locked cabinets, and/or other secured containers and/or devices at the locations and in/on vehicles identified in Attachment A.  Law enforcement shall be permitted to open such locked containers by force or through the use of a locksmith if necessary.

13. Any vehicles and mobile conveyances used and/or associated with unlawful trafficking and manufacturing of firearms, including transporting of any such firearms, firearm parts, or blanks.

14. Any computer numerical control ("CNC") machines and/or parts/tools associated with the use and/or association of the manufacturing and/or modifying of firearms, firearm parts, AR-15 blanks (and firearm blanks of any kind) machineguns and/or machinegun parts including but not limited to templates, cutting programs, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

15. The contents of any surveillance camera or surveillance system used at any of the locations identified in Attachment A.

16. Personal computers, tablets, cellular telephones, encryption devices, paging devices, beepers, and other devices used for wire or electronic communications that could conceivably be used in the course of illegal firearms trafficking and manufacturing.

17

17. Any Bitcoin wallet addresses, seed words, accounts and passwords, or other information necessary to access Bitcoin accounts and wallets, whether such data and documents are stored in documentary or electronic form.

18. Any user names, passwords, text files, encryption codes, or other information necessary to access Dark Web marketplaces or encrypted email accounts, whether such data documents are stored in documentary or electronic form.